UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO.

**MARK A. STEWART**                                             **03-18462**
                                                                SECTION A
DEBTOR                                                          CHAPTER 13

## REASONS FOR DECISION

**I. Facts:**

On October 30, 2003, Mark A, Stewart ("Stewart" or "Debtor"), filed a petition for relief

under chapter 13 of the Bankruptcy Code.[1]  Debtor initially did not list any priority or unsecured

debt, but later amended his Schedules of Assets and Liabilities ("Schedules") to itemize $11,410.00

in unsecured claims.  Debtor's sole, secured creditor held mortgage debt of $76,617.62.[2] By various

acts of assignment, the mortgage debt was transferred to Washington Mutual Bank and then

Countrywide Home Loans, Inc. (hereinafter all holders of the note will be collectively referred to

as "Countrywide").[3]  Countrywide has not disputed that it or its predecessors in interest were given

notice of the filing of the case, the date of the meeting of creditors and the last date to file proofs of

---

[1]  P-1.

[2]  P-1, 20. Debts to Magee Financial, LLC ("Magee Financial") and Southern Finance, Inc. ("Southern Finance"), originally scheduled as secured, were included in the unsecured class after their collateral was surrendered.  Both claimants filed unsecured proofs of claim in the case.  POC 2,5.

[3]  The mortgage submitted to support the secured claim of Countrywide was executed on August 8, 2000, in favor of an undisclosed lender.  On August 8, 2000, Central Progressive Mortgage Corporation by Notarial Endorsement and Assignment of Note assigned to PNC Mortgage Corporation of America a note dated August 8, 2000, in the principal amount of $77,010.00 made by Mark A. Stewart.  On November 27, 2006, Washington Mutual Bank, a savings association, f/k/a/Washington Mutual Bank, FA, and successor to Washington Mutual Home Loans, Inc., f/k/a PNC Mortgage Corp. of America, assigned a mortgage dated August 8, 2000, and executed by Mark A. Stewart, encumbering 154 Trafalgar Square, Slidell, La. for a debt of $77,010.00 to Countrywide Home Loans, Inc. *See*, POC 7-1, P-28, 95.  During these proceedings, BAC Home Loans Servicing, L.P. has filed several pleadings on behalf of Countrywide.

claim.[4]

On October 30, 2003, Debtor filed a proposed plan of reorganization.[5]  The meeting of

creditors was conducted on December 10, 2003.  Countrywide did not attend.[6]  Thereafter, Trustee

objected to confirmation of Debtor's proposed plan on grounds unrelated to the issues before the

Court.[7]  After amendment of Debtor's Schedules, the continued confirmation hearing was held on

February 10, 2004, and Debtor's plan was confirmed ("Plan").[8]  Countrywide did not object to its

treatment under the Plan.

Under Debtor's Plan, monthly payments of $199.50 were owed to the chapter 13 trustee

("Trustee").  The Plan divided these payments between administrative, secured, and unsecured

claims.  At confirmation, Trustee calculated that in a chapter 7 liquidation, unsecured creditors

would receive no distribution.  Under Debtor's Plan, distributions to unsecured claimants of

$4,401.00 or forty-six percent (46%) of filed proofs of claim were anticipated.[9]  Under the

Bankruptcy Code, Debtor was required to commit a minimum of thirty-six (36) months of

---

[4]  The defense of insufficient service of process is waived if not raised in a motion or responsive pleading. FRCP 12(h)(1), which is made applicable to this proceeding by FRBP 7012 and 7001; *see also, T & R Enterprises, Inc. v. Continental Grain Co.*, 613 F.2d 1272, 1277 (5th Cir. 1980).

[5]  P-2.

[6]  P-10.

[7]  P-13.

[8]  P-23, 26.

[9]  Although Debtor's Plan estimated distributions of only one percent (1%) to unsecured claimants, with the removal of Magee Financial and Southern Finance were removed as secured creditors as a result of Trustee's prior objection to confirmation.  As a result, distributions to unsecured creditors increased to $4,401.00 or forty-six (46%) percent.

disposable income to claimants.  Debtor committed to sixty (60) months of payments.[10]

The Plan cured $5,622.41 in prepetition defaults owed to Countrywide.  Debtor also committed to pay all postpetition accruing installments through direct payments to Countrywide. As a secured claimant, Countrywide retained its lien to secure repayment of the prepetition default set forth in the Plan.[11]  On completion, the Plan provided that all prepetition defaults were discharged.

As of the bar date, the following proofs of claim were on file:

| Claimant | Date POC Filed | Priority | Secured | Unsecured |
|----------|----------------|----------|---------|-----------|
| 1. La Dept of Revenue | 2/5/04 | $453.27 | | $131.25 |
| 2. Southern Finance | 2/26/04 | | | $405.76 |
| 3. Sherman Acquisitions | 3/08/04 | | | $5028.91 |
| 4. La Dept of Revenue | 5/24/04 | $67.00 | | |
| 5. Magee Financial | 12/20/04 | | | $3976.34[12] |

After confirmation, Countrywide filed a Motion for Relief from the Automatic Stay.[13]  The Motion alleged that Debtor had failed to pay postpetition accruing mortgage installments.  The Motion did not outline any prepetition defaults.  As a result of the Motion, Debtor and Countrywide agreed to a direct repayment plan.  The agreement was approved by Court Order dated May 12, 2004.[14]  Countrywide still had not filed a proof of claim in the case.

Because Countrywide did not file a proof of claim, Trustee did not make any payments on Countrywide's arrearage.  Instead, Countrywide's portion of Plan payments was diverted to

---

[10]  P-2.

[11]  *Id.*

[12]  *See,* Claims Register.

[13]  P-28.

[14]  P-34.

administrative, unsecured, and priority claimants.  On July 5, 2007, Countrywide filed a Motion to

Allow a Late Filed Claim.[15]  In the Motion, Countrywide requested permission to file a secured

claim forty- six (46) months into a sixty (60) month case and three and one half (3 ½) years after the

bar date.  The Motion represented, "The allowance of the proof of claim will not prejudice the

Debtor."[16]

At the hearing on the Motion, the Court questioned counsel for Countrywide regarding the

amounts set forth in the proposed proof of claim.  Trustee's counsel  was present at the hearing but

did not object to the relief requested.  Debtor did not appear and was unrepresented by counsel.[17]

 As a result, the Court permitted Countrywide to file a late claim.    Countrywide's proof of claim

alleges the following amounts were due on the petition date:

| | |
|---|---:|
| Payments 20 @ $630.25 per month | $12,605.00 |
| Accrued Late Charges | 504.20 |
| Foreclosure Fees & Costs | 2,112.79 |
| Previous Bankruptcy F/C | 750.00 |
| Inspection Fees | 143.25 |
| NSF Fees | 25.00 |
| Appraisal | 30.30 |
| Uncollected Late Charges | 233.69 |
| Total Arrearages | $16,404.23 |

Countrywide's proof of claim also attached a copy of the mortgage allegedly securing the debt.  No

other documentation was attached.[18]

---

[15]  P-70.

[16]  *Id.*

[17]  Debtor was initially represented by Mr. Edward Thompson.  Mr. Thompson closed his legal practice
after August 29, 2005, and following Hurricane Katrina.  He did not, however, formally withdraw as counsel of
record.  Nevertheless, counsel for Countrywide, as well as Trustee, were aware of Mr. Thompson's absence from the
practice and district at all points in time relevant to this matter.  The record does not reflect whether the Debtor knew
of Mr. Thompson's absence from the district or withdrawal from the practice of law.

[18]  POC-7.

The payments due under the Plan totaled $11,970.00. Debtor actually contributed Plan payments plus tax refunds totaling $14,436.75.[19] Trustee began making distributions to Countrywide after the filing of its proof of claim. To date, Countrywide has been paid $4,982.43. The amount paid is less than provided by the Plan and Countrywide's proof of claim.[20]

Trustee also made distributions to other claimants:

| | | |
|---|---|---|
| 1. J. Edward Thompson | $750.00 |
| 2. S. J. Beaulieu, Jr., Trustee's commission | 958.76 |
| 3. Magee Financial | 3,088.03 |
| 4. Sherman Acquisitions | 3,905.80 |
| 5. La Dept of Revenue (priority) | 483.27 |
| 6. La. Dept of Revenue (unsecured) | 101.93[21] |

Fourteen (14) months after Countrywide was allowed to file its late claim, Debtor's last payment was tendered to Trustee. After Debtor had completed his confirmed Plan, Trustee then moved to dismiss Debtor's case alleging the Plan was unfeasible.[22] Trustee alleges that Debtor's failure to fully pay Countrywide's claim is grounds for revocation of confirmation and dismissal of the case. On December 10, 2009, Trustee also filed an Objection to Countrywide's proof of claim.[23]

## II. Law and Analysis

Trustee maintains that Debtor's Plan is "now unfeasible" because Countrywide's proof of claim has not been satisfied. According to Trustee, the Plan does not provide for full payment of

---

[19] P-89.

[20] *Id.*

[21] *Id.*

[22] P-79.

[23] P-82. Trustee's initial Objection was based on the claims' untimely filing but was expanded at subsequent hearings on these matters to include an objection to the amounts claimed.

secured claims as required by 11 U.S.C. § 1325, making it unfeasible in hindsight.  Trustee argues

that the Plan is now unfeasible, and because no feasible plan can be proposed given the case's age,

the case should be dismissed, effectively denying Debtor both his discharge and fresh start.

Trustee's Motion to Dismiss is effectively a request to revoke confirmation of a plan five (5)

years after the order of confirmation was issued.  A final order of confirmation may only be

challenged within one hundred eighty (180) days of entry for fraud.[24]  No fraud has been alleged,

but clearly any request for revocation is untimely.

Rather than revocation or dismissal based on present day "unfeasibility," the issue presented

is what effect does the prior confirmation have on Countrywide's claim?

At all times relevant to these proceedings, Countrywide was aware of Debtor's case.[25]

Countrywide has raised no objection to service of the notices attendant with the case including the

notice of case filing, date for the meeting of creditors, bar date to file proofs of claim and hearing

on confirmation of Debtor's Plan.  Although the Plan was clearly insufficient to satisfy the amounts

Countrywide alleges were owed in prepetition defaults, Countrywide argues that it was not required

to object to confirmation in order to protect its rights.  Instead, Countrywide maintains that having

filed its claim, albeit late,  Debtor cannot receive a discharge under the Plan because the claim has

not been paid in full.

The conflict before the Court represents the worst case scenario for the "honest but

unfortunate debtor."[26]  Debtor filed his chapter 13 proceeding on October 30, 2003.  His stated

---

[24] 11 U.S.C.§ 1330(a).

[25]   Within months of the petition date, Countrywide filed a Motion for Relief from the Automatic Stay
further evidencing its knowledge of the case. P-28.

[26] *Local Loan Co. v. Hunt*, 292 U.S. 234 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

intention was to protect his home from foreclosure by satisfying the past due amounts owed to Countrywide.  Initially, he was represented by counsel who prepared, filed and served a copy of his proposed plan of repayment on all creditors including Countrywide.  Debtor's Plan provided for payment of $5,642.91 on the prepetition amounts owed Countrywide.  In addition, Debtor committed to continue to make regular monthly installment payments equal to the accruing monthly mortgage note payments directly to Countrywide.

Countrywide received Debtor's Plan but did not object to its terms.  Forty-six (46) months into Debtor's case, Countrywide realized that it had not received any distributions because it had not filed a proof of claim.  It then filed a Motion for permission to file a late claim.[27]

Counsel for Countrywide represented in the Motion that the claim would not prejudice Debtor.  Trustee's counsel did not argue otherwise.  The Debtor did not appear at the hearing, and his counsel was absent because he had quit the practice of law sometime earlier.  Since no one objected to the late filing of Countrywide's claim, the Court gave Countrywide permission to file it.  However, at the time, the Court was unaware that the filing of the claim would make the Plan unworkable as confirmed.  Based on Countrywide's representation that the claim would not prejudice Debtor and Trustee's silence, the Court assumed just the opposite.  Neither Countrywide nor Trustee objected to the continuation of Debtor's case at that point in time.   Instead, Trustee made and Countrywide collected payments for the next fourteen (14) months even though both evidently believed the Plan was now unfeasible and Debtor could not obtain a discharge.

Bankruptcy in general, and Chapter 13 in particular, is designed to administer the assets and income of a debtor for the benefit of claimants existing on the petition date.  All claims against a

---

[27] P-70.

7

debtor existing on the petition date, whether matured, unmatured, contingent or uncontingent, liquidated or unliquidated are subject to the jurisdiction of the Bankruptcy Court and Code.

A chapter 13 proceeding is not unlike a corporate reorganization. In chapter 13, a debtor lists all claimants, secured, unsecured and priority. He also lists all property interests held, itemizes his income and, after deducting certain living expenses, calculates his disposable income. He then prepares a proposed plan which is filed with the Court and sent to all potential claimants. Following the submission of this information, Trustee conducts a meeting of creditors.

At the meeting of creditors, the debtor is sworn in under oath. The meeting is open to all claimants along with Trustee who are free to examine the debtor on any matter of interest. Typically, Trustee reviews a debtor's schedules and statement of financial affairs to assure himself that all assets, existing and projected income and expenses have been properly disclosed. At the meeting of creditors, Trustee questions the debtor and his counsel regarding any issues raised by this review. He also examines each debtor's proposed plan for both feasibility (the ability of a debtor to perform) and satisfaction of the legal criteria necessary for confirmation (payment of liquidation value, term and commitment of disposable income).

Chapter 13 provides for repayment of past due amounts owed to secured creditors through periodic payments to Trustee. Any amounts accruing postpetition are typically paid by a debtor directly to the secured creditor as they mature. Because the goal of virtually every chapter 13 plan is to cure prepetition defaults on secured debt, the amount of the secured creditor's arrearage is a driving force in the chapter 13 process. Nevertheless, since debtors are required to file their proposed plans within fourteen (14) days of the petition date and before secured claimants file their proofs of claim, the debtor must estimate the arrearage owed in the proposed plan.

8

Once the proposed plan is on file, it is sent to all parties on the mailing matrix.  It is at this juncture that debtor's counsel expects to receive either a proof of claim or objection to confirmation by the secured lender if the estimate is incorrect.  Confirmation of a debtor's plan is usually considered within 120 days of filing giving the secured lender four (4) months to review the plan, attend the meeting of creditors, object to confirmation and file a proof of claim.

If a proposed plan does not provide distributions in an amount sufficient to a cure a secured creditor's default, Trustee will routinely object to or debtor's counsel will amend the proposed plan to rectify the situation.  This occurs with or without an objection from the secured creditor.  Of course if no proof of claim has been filed, there is no mechanism to verify the debtor's estimate of the prepetition default, and everyone involved in the process must assume that the plan correctly provides for the secured lender's claim.

While priority in payment is based on the Bankruptcy Code, no claimant may be paid without a filed proof of claim, even a secured one.  Only "allowed" claims may be paid under a plan.[28]  The first step towards allowance is the filing of a proof of claim.[29]  Upon the filing of a claim, the debt asserted is "deemed allowed" unless an objection to its validity is filed.[30]  Thus, a claim that has been "deemed allowed" is still subject to objection, but presumed to be valid until challenged.[31]

---

[28]  11 U.S.C.§ 502(b).

[29]  11 U.S.C. § 501.

[30]  11 U.S.C. § 502(a).

[31]  A proof of claim filed in compliance with Bankruptcy Rule of Procedure 3001 is *prima facie* evidence of the amount of the debt.  However, a proof of claim which fails to provide the support required by Bankruptcy Rule 3001is not afforded *prima facie* status.  *In re Consolidated Pioneer Mortgage*, 178 B.R. 222, 226 (9th Cir. BAP 1995); *In re Rogers,* 391 B.R. 317, 322 (Bankr.M.D.La. 2008); *In re DePugh*, 409 B.R. 84, 97-98 (Bankr.S.D.Tex). 2009); This difference is relevant when the claim is challenged.

Status as a "deemed allowed" claim is important to the bankruptcy process. A claim that is "deemed allowed" may receive distributions. However, because a "deemed allowed" claim is always subject to later objection, those distributions are also subject to recovery or disgorgement until the case is complete.[32] The preservation of objections to claims, even following confirmation, is for important and practical reasons.

Within thirty (30) days of a chapter 13 filing, debtors begin making payments to Trustee based on the amounts proposed by their plans.[33] Because the proposed plan has not been confirmed, the payments are escrowed pending confirmation. Once confirmation has been granted, Trustee begins the distribution process. Since no claimant is paid pending confirmation, significant pressure to confirm a plan as quickly as possible exists.

If a debtor includes for payment in his plan the "deemed allowed" secured claim, the plan can be confirmed while simultaneously reserving right to review and object to the claim at a later date if warranted.[34] Otherwise, confirmation, and distributions to all claimants, would be delayed until litigation over the claim was completed. Because the Code allows for confirmation of a plan while reserving the right to object to claims, all claimants, including secured creditors, begin

---

[32] "Bankruptcy Rule 3007 sets no time limit within which the trustee must object to the allowance of a claim." Collier's P502.02[3][e]. *In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991); *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992); *In re Consolidated Pioneer Mortgage*, 178 B.R. 222 (9th Cir.BAP 1995); Advisory Committee Note to Federal Rules of Bankruptcy Procedure 3007 ("By virtue of the automatic allowance of a claim not object to, a dividend may be paid on a claim which may thereafter be disallowed on objection pursuant to this rule. The amount of the dividend paid before the disallowance in such event would be recoverable by the trustee....").

[33] 11 U.S.C. § 1326.

[34] *In re Morton*, 298 B.R. 301, 309 (6th Cir.BAP Ohio 2003); *In re Barton*, 249 B.R. 561 (Bankr.E.D.Wash. 2000).

10

receiving payments within a reasonable period of time.[35]

Since distributions are based on filed proofs of claim, in the absence of a secured creditor's proof, distributions will "waterfall" to the next class in priority, often the unsecured claimants. Because plans cannot extend beyond sixty (60) months, it is critical to a debtor's fresh start that the correct prepetition amount owed to a secured claimant be established early lest distributions intended for the secured class be diverted to the unsecured. Thus, the timely filing of a major secured claim is paramount to the overall success of the case.[36]

Countrywide filed a late claim but maintains that this benefitted Debtor by reducing, if not satisfying, prepepition debt. It objects to discharge of the unpaid remainder on the basis that its claim is an allowed secured claim that remains unpaid. Since an allowed secured claim must be paid in order for a plan to be confirmed, and this Plan did not so provide, the confirmation should be revoked for unfeasibility or at a minimum, Debtor should be denied a discharge of its debt.

## A. Debtor's Confirmed Plan Is Res Judicata

Under long standing Fifth Circuit precedent, plans could not affect a creditor's right to the amount claimed or security held. The Fifth Circuit routinely and consistently has interpreted a secured claimant's right to receive the full value of its allowed secured claim as sacrosanct. The

---

[35] As a leading commentator notes, "The practical consequence of this provision is that neither the trustee nor the court should be burdened by the making and considering of objections to claims when the disposition of the objection can have no consequence in the administration of the estate such as when no distribution is contemplated." 4 Collier on Bankruptcy ¶ 502.02[3][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[36] While FRBP 3004 allows a debtor to file a proof of claim for a creditor that does not file, in this case, debtor's failure to do so would not have avoided the situation at hand. Presumably if Debtor had filed a proof of claim for Countrywide, it would have been for the amount provided in the Plan, $5,622.41. Since a proof of claim may be amended, presumably Countrywide would have claimed its additional arrearages later in the case. Thus, the issue of whether or not Countrywide should be bound to the terms of the Plan as confirmed would not have been avoided.

seminal case on the subject is *In re Simmons*.[37]

In *Simmons,* the debtor, Simmons, contracted for plumbing repairs prepetition. Following completion of the repairs, the plumber, Savell, filed a lien against Simmons' home and later a suit to enforce. Simmons filed bankruptcy before the suit was tried. Savell responded by filing a secured proof of claim for the amount owed.

In his chapter 13 plan, Simmons treated the Savell claim as an unsecured debt despite Savell's assertion of secured status. Although Savell voted in favor of the plan, he objected to treatment as an unsecured claimant. The Bankruptcy Court failed to take notice of Savell's objection, and the plan was confirmed.

Despite Savell's treatment under the plan as unsecured, the chapter 13 trustee refused to ignore Savell's secured status without objection to the claim. As a result, Simmons filed an adversary proceeding against Savell to enforce the plan's terms. Specifically, Simmons sought cancellation of the notice of lien based on the confirmation order. The Bankruptcy Court refused to order cancellation of the lien and an appeal followed. At issue was the primacy of a confirmed plan or filed proof of claim.

Section 1325 requires that all allowed secured claims be paid in full under a plan or confirmation cannot be obtained. Despite Savell's secured proof of claim on file with the Court, the Bankruptcy Court confirmed Simmons' plan, in error, and Savell did not appeal the confirmation order.

On appeal, Simmons argued that the confirmation order was *res judicata* as to Savell's claim. Specifically, Simmons cited 11 U.S.C. § 1327 which provides:

---

[37] *In re Simmons*, 765 F.2d 547 (5th Cir. 1985).

Effect of Confirmation

(a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has object to, has accepted, or has rejected the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all the property of the estate in the debtor.

(c) Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

A plain reading of the above provision leads one to the conclusion that confirmed plans are binding on the parties and that property of the estate revests in the debtor free and clear of all claims or interests except as provided for by the plan.

The problem for the *Simmons* Court was the plan's failure to challenge Savell's claim by a means procedurally sanctioned in the Code. Thus, *Simmons* turned on whether or not the confirmation process could substitute for a formal claim objection and, through confirmation, alter a claim's treatment. The *Simmons* Court began by analyzing the objection process and whether or not the confirmation process satisfied its due process concerns.

All claims objections must be filed as either contested matters or adversary proceedings. In either instance, the *Simmons* Court reasoned that notice of the objection or service of the complaint would be required on the claimant. Because the plan confirmation process did not specifically require service of the plan itself, or necessarily highlight the proponent's intention to reduce or object to a filed claim, the *Simmons* Court concluded that notice of confirmation was procedurally insufficient to substitute for an objection to the claim. Without proper notice, the claimant had not been afforded due process. As a result, the confirmation order was not *res judicata* on the issue.

13

*Simmons* spawned a lengthy list of cases that adopted its rationale.[38]   This led secured lenders to conclude that nothing in a plan could substitute for a formal objection to a secured claim or alter its treatment.  A recent United States Supreme Court decision challenges this conclusion and requires this Court to revisit the principles espoused in *Simmons*.

In *United Student Aid Funds, Inc. v. Espinosa,* a debtor proposed a plan that fully paid a student loan without interest.[39] Although the creditor received notice of the plan and the  provisions regarding treatment of its claim, it did not object to confirmation.  The plan was confirmed, the debtor satisfied the plan's required payments and received a discharge.  After the case was complete, the student loan claimant filed suit to recover accrued and unpaid interest on its claim.  The debtor resisted based on his prior discharge.

Generally, student loan obligations are nondischargeable and, if not fully paid, survive bankruptcy without the necessity of objection by the claimant.[40]   However, in limited  situations, a student loan debt can be discharged if the debtor proves that repayment would constitute an undue hardship.[41]  In order to be granted a discharge based on hardship, the debtor must file an adversary proceeding before the bankruptcy court.[42]  In *Espinosa*, the debtor had not requested a hardship discharge but merely provided, through the plan's terms, that no interest would be paid on the debt postpetition.

---

[38]   *See also, In re Howard*, 972 F.2d 639 (5th Cir. 1992); *In re Cook*, 25 F.3d 1043, 1994 WL 261083 (5th Cir. 1994); *In re Chesnut*, 356 Fed.Appx. 732, 2009 WL 4885018 (5th Cir. 2009).

[39]   *United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367, 176 L.Ed.2d 158, 78 USLW 4207 (2010)

[40]   11 U.S.C. §§ 1328(a)(2) and 523(a)(8).

[41]   11U.S.C. § 523(a)(8).

[42]   FRBP 7001.

14

The *Espinosa* Court held that a confirmed plan was binding on the parties and a claimant's failure to object to its treatment in a plan bound it to the plan's provisions even if those provisions violated the Code or accomplished discharge or disallowance of a claim through a procedurally defective method.

In discussing its rationale, the Supreme Court acknowledged that the discharge of a student loan obligation, including the interest which accrued postpetition, was normally prohibited. It also acknowledged that under both the Code and existing precedent, a student loan claimant was not required to take any action to protect its interest from discharge unless the debtor filed a formal complaint for discharge with the bankruptcy court. The Supreme Court also admitted that the *Espinosa* plan accomplished by its terms a partial discharge of the student loan debt not otherwise allowed substantively or procedurally.

Nevertheless, the Court held that the principle of *res judicata* was paramount. Finding that the claimant in *Espinosa* had received a copy of the plan and the notice of confirmation hearing, the Supreme Court concluded that the claimant's failure to object to confirmation or appeal the confirmation order resulted in a final judgment discharging any claim to interest on the debt. Due process requires, "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[43] In the *Espinosa* Court's opinion, a creditor could not wait until the plan's conclusion, years later, to assert its rights. To do so would amount to a collateral attack on a final order.

*Espinosa* cannot be distinguished from *Simmons* or its progeny. In both *Simmons* and *Espinosa*, the claimants were noticed of the bankruptcy case and the confirmation hearing, objection

---

[43] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct 652, 657 (1950).

deadline and plan.  Both claims were entitled to treatment not provided for by the plans but both

plans were confirmed, and the orders became final.   While *Simmons* reasoned that a debtor's failure

to follow the procedural requirements for challenging a claim constituted a failure of due process,

*Espinosa* squarely rejected this argument.[44]

Under the precedent set by *Espinosa*, Countrywide's failure to object to its treatment  under

the Plan after notice, results in a reduction of the amount owed regardless of the amount set forth

in its proof of claim.   That amount forms the maximum amount Countrywide may receive for its

claim.[45]

## B.  Review of Countrywide's Claim is Proper

As previously explained, the filing of a proof of claim is only the first step in the allowance

process.  At filing, proofs of claim are provisionally allowed so that a case's administration may

proceed; although, a proof of claim is always subject to review and objection at any time during a

case.[46]  To overcome this legal hurdle, Countrywide asserts that the Court's prior Order permitting

Countrywide to file an untimely claim also substantively allowed the claim itself.   From this

position, Countrywide argues that Trustee's Objection is a collateral attack on the prior Order.  It

also asserts that the Order is *res judicata* and cannot be disturbed.  Alternatively, Countrywide

---

[44] A recent Fifth Circuit decision, *In the Matter of Chesnut*, 356 Fed.Appx. 732, 2009 WL 4885018 (5th Cir. 2009), appears to recognize this result.  Although not completely analogous to the facts of this case or *Espinosa*, the *Chesnut* Court held that *res judicata* applies to confirmed Chapter 13 plans citing *Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009); 11 U.S.C. § 1327(a) (the provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted or has rejected the plan); and somewhat inconsistently, *In re Howard*, 972 F.2d at 641 and *Simmons*.

[45] *In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991); *In re Morton*, 298 B.R. 301, 309 (6th Cir.BAP 2003); *In re Chapter 13 Proceedings of Herrera*, 369 B.R. 395, 400-401 (E.D.Wis. 2007).

[46] *See supra* nn. 32 and 34.

16

asserts that the principle of laches applies to the Objection.

### 1.  Bankruptcy Rule 9024 And The Court's Inherent Authority Allow Correction

Assuming for the sake of argument that the Order in question substantively allowed Countrywide's claim, it would be in error.  In a chapter 13, all claims must be filed by the bar date. Failure to file a claim timely subjects it to disallowance.[47]  The existence of a bar date forces claimants to present their debts within a few months of filing.  This assists everyone involved in the process by defining the universe of claims to be administered and, in turn, the provisions of a plan that must be proposed.  In addition, since distributions are made based on the claims on file, the entry of a late claim will change future distributions to every other creditor and potentially require disgorgement of past distributions in order to properly equalize payments to claimants in the same class.  The potential for administrative disruption of a case is so great, that rarely does this Court grant a creditor permission to file a late claim.  For this reason, Countrywide's Motion was both unusual and stands out in the Court's memory.

When Countrywide requested permission to file a late claim, the relief was granted because Countrywide represented that Debtor would not be prejudiced.  The Court also believed that once Countrywide filed its claim, Trustee and Debtor would have the opportunity to review and object to the claim if warranted.  At the hearing on the Motion, the Court questioned counsel for Countrywide regarding the amounts claimed and expressed reservations based on a facial review of the itemized amounts.  Approval of the Motion was supposed to allow the filing of the claim but not bar its further, substantive review.  To the extent the Order can be read to waive this right, it is in error.

---

[47]  11 U.S.C. § 502(b)(9).

Under Federal Rule of Civil Procedure 60(a), which is made applicable to this proceeding by Bankruptcy Rule 9024, a Court may on its own, with or without notice, correct a clerical mistake or mistake arising from oversight or omission whenever one is found in an order. In addition, Bankruptcy Courts have general authority to change the terms of their own orders when equity so requires.[48] The power is "ancient and elementary."[49] The bankruptcy judge has the power to reexamine and revise an order entered during the pendency of bankruptcy proceedings.[50]

For these reasons the Court will amend its prior Order to remove any doubt as to the relief ordered.

## 2. Section 502(j) Also Allows Reconsideration

Further, section 502(j) provides that the allowance or disallowance of a claim may be reconsidered for cause at any time according to the equities of the case. Thus, in addition to the Court's inherent authority to correct or reexamine its prior Order, Trustee's Objection may be heard under section 502(j) and is not a collateral attack on the Court's prior ruling. For the same reason, the prior Order is not *res judicata* but remains subject to reconsideration.

Nevertheless, even when cause exists, reconsideration of a final order also requires an examination of the effect on the opponent. Final judgments, those that dispose of substantive rights, are subject to reconsideration if a party has not substantively changed its position in reliance

---

[48] *In re Olsen*, 861 F.2d 188, 189 (8th Cir. 1988); *In re Twenver*, 149 B.R. 950, 952 (Bankr. D.Colo. 1993); *UNR Industries, Inc. v. Bloomington Factory Workers*, 173 B.R. 149, n.10 (Bankr.N.D.Ill.1994); *In re Radco Merchandising Services, Inc.*, 111 B.R. 684, 689 (Bankr.N.D. Ill.1990).

[49] *In re Pottasch Brothers, Co.*, 79 F.2d 613, 616 (2d Cir. 1935).

[50] *In re Meter Maid Industries, Inc.,* 462 F.2d 436, 439 (5th Cir. 1972).

18

of the court's order.[51]  The decision to reconsider an order hinges on the ability of the court to return the opposing party to the position it occupied prior to entry.[52]

Countrywide can be returned to the position it occupied prior to the execution of the Order and the position the Court intended to convey.[53]  Although Countrywide asserts that to do so would prejudice its position in the case, it has not proven its assertion.  Countrywide has not varied its position as a result of the Order, nor did the Order irretrievably eliminate any substantive rights.  The only change in Countrywide's status is that it must now establish its claim.  It has shown no prejudice at being so required.

### 3.  Application of A Laches Defense Is Inappropriate

Countrywide maintains that review of its proof of claim is prohibited under the doctrine of laches.  Laches is an equitable doctrine.  It requires dismissal of an otherwise meritorious claim when an inexcusable delay has unreasonably prejudiced the defendant.[54]  As previously set forth, Countrywide has shown no prejudice as a result of the delays which have occurred in the examination of its claim.  The Code authorizes objections to claims at any time during the pendency of a case.  Therefore, even now, hearing on an objection to claim would be timely.[55]  Laches is an

---

[51] *Wayne United Gas Co. v. Owens-Illinois Glass Co.*, 300 U.S. 131, 137, 57 S.Ct. 382, 385, 81 L.Ed. 557 (1937).

[52] *Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 1101 (2d. Cir. 1979).

[53] According to Countrywide, the prior Order granted two separate requests.  First, Countrywide was permitted to file an untimely claim.  The Court sees no reason to disturb this ruling.  The second benefit allegedly conveyed was substantive allowance of the claim.  It is this portion of the Order, and only this portion, that will be reconsidered.

[54] *Steel, Inc. v. Windstein*, 55 B.R. 426, 430 (Bankr. E.D.La. 1985).

[55] *In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991).

inappropriate bar to the assertion of a claim when analogous statutes of limitation have not expired.[56]

For the reasons set forth above, the Court concludes that it is free to correct or reconsider its prior Order authorizing Countrywide to file a late claim and arguably substantively allow that claim. Because a portion of the relief contained in the Order does not reflect the relief actually granted, the Court will correct this error. To do otherwise would result in an injustice to Debtor and is not prejudicial to Countrywide.

### C.  Countrywide's Claim Is Unsupported By The Record.

An analysis of Countrywide's claim begins with the burden of proof. Attached to Countrywide's proof of claim is a copy of its mortgage. The proof of claim fails to provide a copy of the note upon which the claim is based or any documentation to support the charges and fees claimed. As a result, the proof of claim fails to comply with the requirements of Bankruptcy Rule 3001 and is not *prima facie* evidence of Countrywide's debt.

The Objection to the proof of claim requires Countrywide to establish its claim. Countrywide was directed to provide all supporting documentation for its claim including a full loan history and escrow analysis. Countrywide offered a copy of its mortgage, a loan history, and invoices to support its claim for attorneys fees and costs. Countrywide's proof provided documentation to support some of its claim but failed in material respects to establish its entire debt. Notably, Countrywide failed to provide the Court with a copy of its note.[57] A review of the invoices submitted from Countrywide's legal counsel provides a clue as to why this critical piece of evidence was omitted.

---

[56] *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985).

[57] Proof of the note has been entirely absent throughout this case as Countrywide did not provide a copy of its note when it filed its Motion for Relief, early in this case, nor when it filed its Motion to File a Late Claim.

In January 2002, Countrywide's counsel billed Countrywide for costs incurred in connection with the advertisement of a lost note. Under Louisiana law, this practice allows holders of missing notes to publicly advertise for their return.[58] Presumably the note was not found.

When a note is missing, the lender must offer proof of its existence through other means. Typically a copy of the note, certified by the closing notary to be true and correct, is offered.[59] In this case, no copy was produced.

Under Louisiana law, the interest rate chargeable on debt secured in whole or in part by a mortgage on immoveable property must be in writing.[60] Testimonial proof of the interest rate is not admissible.[61] With regard to the other provisions of repayment, if the debt exceeds five hundred dollars, the repayment terms must be proven by at least one witness and other corroborating circumstances.[62]

In the absence of a note, the Court begins its analysis by examining what portions of Countrywide's claim have been proven by the evidence offered.

## 1. Missed Installment Payments

Countrywide's mortgage, dated August 8, 2000, provides security for a debt of $77,010.00, payable monthly with interest. The mortgage also provides, "the full debt, if not paid earlier, [is] due and payable on September 1, 2030."[63] No rate of interest is specified in the mortgage, nor is it

---

[58] La. R.S. 13:3741.

[59] La. C.C. Art. 1840.

[60] La. RS. 9:3503.

[61] *Id.*

[62] La.C.C. Art. 1846.

[63] Exhibit to POC-7, p. 1.

21

determinable from the mortgage.

Debtor's Schedules and Plan constitute admissions by Debtor, under oath, as to the existence of the debt.  Under prevailing state law, the Court accepts Debtor's Schedules as independent testimony supporting the existence of the debt.  The mortgage corroborates this testimony.  The mortgage also establishes the amortization rate of the debt, thirty (30) years.  However, neither the mortgage nor Debtor's Schedules specify the amount of principal and interest that must be paid each month.[64]

Countrywide has failed to offer the note or a certified copy of the note into evidence.  As a result, it has presented no independent writing to establish the applicable interest rate on the debt.  Because there is no independent written proof or admission by Debtor of the applicable interest rate for this obligation, the rate of interest has not been established.  As a result, Countrywide's claim for past due interest on the debt must be disallowed.

In order to calculate the portion of Countrywide's claim attributable to interest, the loan history must be revised to eliminate application by Countrywide of payments to accruing interest.  According to Countrywide's loan history, Debtor paid $11,585.41 over the life of the loan.  Assuming a thirty (30) year amortization of the principal balance, $213.92 per month would be required to amortize the loan.[65]  The loan was thirty-eight (38) months old on the petition date.  Thus, $8,128.96 of Debtor's payments should be applied to reduce the loan's principal balance.  Since the amounts paid are sufficient to satisfy Debtor's installment obligations through filing, Debtor's installments are current as of the filing date.

---

[64]  Schedule J does identify a monthly payment for this debt, but it includes sums for property taxes and insurance.  Therefore, nothing in Debtor's Schedules evidences or admits to the applicable rate of interest owed on the debt.

[65]  $77,010.00 / 360 = $231.92

### 2. Late charges

Countrywide claims $737.89 in past due late charges. The mortgage provides that a late charge equal to four percent (4%) of the principal and interest due on any monthly installment may be assessed if payment is not received within fifteen (15) days of maturity. Because Countrywide's late charges vary in amount throughout the loan's history, the Court can only conclude that the monthly installment payments also fluctuated. However, Countrywide failed to provide proof of the amount due for any particular installment. As set forth above, at a minimum, principal payments of $213.92 were required to amortize the loan resulting in a potential late charge of $8.56 for each late payment.

The record established that Debtor failed to make a payment within the time constraints set forth in the mortgage in each of twenty-seven (27) months. As a result, the Court will allow twenty-seven (27) late charges of $8.56 each or $231.12.

### 3. Inspection Charges

Countrywide claims $143.25 is owed in inspection charges. It also claims $30.30 in appraisal charges. According to Countrywide's loan history, it charged various amounts ranging from $7.85 to $7.25 per inspection. During the period of September 2001 to December 2001, Countrywide's loan history also itemized four (4) monthly charges of $7.85 which it described as "BPO" or Broker's Price Opinion charges. Based on the amounts charged and frequency, the Court finds that these charges are actually additional property inspection fees.

According to Countrywide's loan history, Debtor's first missed payment was in July 2001. A property inspection was allegedly made following that event. Twenty-three (23) property inspections allegedly followed, with the latest occurring in November 2003. None of the inspection reports or invoices were provided as proof that the inspections were made or charges incurred. In

23

addition, Countrywide did not establish why monthly inspections were warranted or advisable.

Because Countrywide failed to provide proof of the inspection charges incurred or paid, they are disallowed.  The Court also finds that Countrywide failed to establish that twenty-four (24) inspections performed over twenty-eight (28) months was reasonable. During this same period, Debtor made payments.  Evidently, the payments were insufficient to cure Debtor's alleged and burgeoning prepetition debt, but the frequency and amount of payments over the period indicated an attempt by Debtor to retain his home and prevent foreclosure.  As a result, the Court cannot conclude that the property was at risk without additional evidence to the contrary.  Countrywide offered no explanation as to its position.  Therefore, the inspection charges are disallowed.

### 4. Attorneys' Fees and Costs Of Foreclosure

Under its proof of claim, Countrywide alleges it is owed attorneys' fees and costs of foreclosure equal to $2,112.79.  It also alleges attorneys' fees and costs in connection with a prior bankruptcy proceeding of $750.00.   In support of its claim, Countrywide produced itemized statements from its foreclosure counsel.  The statements total $3,493.84 not the $2,862.79 claimed. They also contain amounts previously paid, not due or not approved for payment.

For example, the statements itemize $173.25 in fees and costs associated with Countrywide's attempt to locate its lost note.  As this Court has previously concluded, fees and costs incurred in connection with a lender's failure to maintain its own notes are not properly chargeable to a borrower.[66]  The statements include a $150.00 fee for the filing of the proof of claim, a charge not previously approved by this Court and not authorized by existing precedent in this district.[67]  The

---

[66] *Jones v Wells Fargo (In re Jones)*, 366 B.R. 584 (Bankr. E.D.La. 2007).

[67] *Id.* and *In re Stewart,* 391 B.R. 327, 351 (Bankr. E.D.La. 2008).

24

statements also include $825.00 in fees and costs associated with the filing of a motion for relief in

a prior case that were not approved by that court.  Based on the foregoing, the Court will allow

outstanding fees and charges in the amount of$2,345.59.

To summarize, Countrywide has proven the following prepetition charges:

| | |
|---|---|
| 1. Late fees | $ 213.12 |
| 2. Attorney's fees and costs | 2,345.59 |
| 3. NSF charge | 25.00 |
| Total | $2,583.71 |

These amounts must be deducted from payments made by Debtor on the loan and after satisfaction

of the principal amortization and escrow charges Countrywide established.  The calculation is:

| | | |
|---|---|---|
| | Total prepetition payments | $11,585.41 |
| Less: | Amounts applied to principal | $8,128.96 |
| | Payments for insurance[68] | 790.65 |
| | | 798.00 |
| | Subtotal | $1,867.80 |
| Less: | Other fees and charges | $2,583.71 |
| | Total allowed claim | [$   715.91] |

### D.  Trustee's Disbursement History

Trustee's Disbursement History[69] itemizes payments to claimants:

| Claimant | Claimed Priority | Claimed Secured | Claimed Unsecured | Claimed Adm | Paid |
|---|---|---|---|---|---|
| 1. La Dept of Revenue | $520.27 | | | | $483.27 |
| 2. La Dept of Revenue | | | $131.25 | | $101.93 |
| 3. Southern Finance | | | $405.76 | | $166.53 |
| 4. Sherman Acquisitions | | | $5028.91 | | $3,905.86 |
| 5. Magee Financial | | | $3976.34 | | $3,088.03 |
| 6. Countrywide | | $16,404.23 | | | $4,982.43 |
| 7. Edward Thompson | | | | $750.00 | $750.00 |
| 8. Trustee | | | | $958.76 | $958.76 |

Debtor paid $14,436.75 into his Plan.  The Plan proposed distributions in accordance with

[68] Countrywide's loan history reflects a single insurance payment of $790.65.  However, a second payment of $798.00 was made but improperly entered on the loan history.  The Court has corrected the error to allow Countrywide the charge.

[69] P-89.

the Bankruptcy Code.  Under the Code,  administrative and priority claims must be paid prior to the payment of secured and unsecured claims.  While administrative claims have been paid, Trustee failed to fully pay priority debt owed to the Louisiana Department of Revenue.  As a result, $37.00 is still owed on that claim.

After fully satisfying administrative and priority claims, $12,207.72 remains available for distribution to secured and unsecured claimants.  The total amount due both classes is $10,258.17.  While Countrywide has been over paid, amounts are still owed to Southern Finance ($239.23), Sherman Acquisitions ($1,123.05), Magee Financial ($888.31) and the Louisiana Department of Revenue's unsecured claim ($29.32).  These sums and the remaining priority claim shall be paid from the amounts returned by Countrywide.

## III. Conclusion

Because Countrywide has already received $4,982.43, Debtor's obligations to Countrywide under the Plan have been fully satisfied, and Debtor is entitled to a discharge.  Countrywide's proof of claim will be disallowed to the extent it exceeds $715.91.  Countrywide will be ordered to reimburse Trustee $2,316.91 from which Trustee will satisfy the remaining debt owed to other claimants.  Countrywide will also be ordered to credit Debtor's account $1,949.61 for the residual overpayment by Debtor.  Debtor will be granted a discharge.  Trustee's Motion to Dismiss for Failure to Make Plan Payments will be denied.  An order in accord with these Reasons will be separately rendered.

New Orleans, Louisiana, August 23, 2010.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge